## GOVERNMENT of the VIRGIN ISLANDS, and the UNITED STATES of AMERICA, Plaintiffs,
## v.
## NEFTA PETERSEN, Defendant.

D.C. Crim No. 1995-63

District Court for the District of Virgin Islands

Division of St. Thomas and St. John

August 28, 1998

*For plaintiffs:* KIM CHISHOLM, ESQ., Ass't United States Attn'y.

*For defendant:* MICHAEL DUNSTON, ESQ., St. Thomas.

Moore, *Chief Judge*

## MEMORANDUM

This matter is before the Court on defendant's motion to withdraw his plea of guilty following remand of the case from the Third Circuit Court of Appeals.[1] The appellate court has vacated the defendant's sentence and returned the case to this Court for an evidentiary hearing on the instant motion.

This Court has general criminal jurisdiction on issues of federal and constitutional law equivalent to that of a district court of the United States under Revised Organic Act of 1954 ["Revised Organic Act" or "Rev. Org. Act"] § 22(a), 48 U.S.C. § 1612(a).[2] The Court has specific jurisdiction in this case as the defendant has been charged with three violations of federal law: (1) assault upon a federal officer in the performance of his official duties (18 U.S.C. § 111(a)(1)); (2) attempted murder of a federal officer (18 U.S.C. § 1114); and, (3) use of a firearm in the commission of a crime of violence (18 U.S.C. § 924(c)(1)). The information filed Feb. 23, 1995, also charged two violations of Virgin Islands law: (1) second degree murder (V.I. CODE ANN. tit. 14, § 922(b)); and (2) assault with intent to commit murder (14 V.I.C. § 295(1)). This Court has concurrent jurisdiction of these local offenses since the charges arise from the same factual nexus as federal offenses.REV. ORG. ACT § 22(c), 48 U.S.C. § 1612(c). For the reasons which follow, defendant's motion will be denied.

---

[1] *United States v. Petersen*, 92 F.3d 1174 (3d Cir. 1996) (unpublished opinion).

[2] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1994), *reprinted* in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1997) (preceding V.I. CODE ANN. tit. 1) ["Revised Organic Act"; or "REV. ORG. ACT".

## RELEVANT FACTS

Sometime after 9:00 p.m. on June 15, 1993, United States Coast Guard Lieutenant, Patrick Gardella ["Lt. Gardella"], assigned aboard the guided missile cruiser USS Yorktown (CG-48), went ashore to make a phone call. The nearest telephones at Crown Bay dock in an area of St. Thomas known as Subbase were in use. About a dozen other servicemen were already in line, one of whom was an acquaintance of Lt. Gardella, United States Navy Lieutenant Dana Bartlett ["Lt. Bartlett"]. (Presentence Investigation Report Crim. No. 1995-63 ["Presentence Rpt."] ¶ 13).[3] Lt. Gardella suggested that they try some other phones at tennis courts nearby and both officers, in full uniform, walked down to the tennis courts together, where they found one of their shipmates, United States Navy Petty Officer Third Class Michael Nendze ["Petty Officer Nendze"], already talking on the only telephone. (*Id.*) Nendze was also in uniform.

At approximately 9:30 p.m. on the same night, the defendant, Nefta Petersen ["Petersen"], then age 18, along with codefendants Ansel Cielto ["Cielto"], also then age 18, and a juvenile, met in the Bordeaux area of St. Thomas. (*Id.* ¶ 11.) The group discussed going out on the town, but first decided to remedy their lack of funds by robbing some sailors in town from the USS Yorktown. (*Id.*) The minor brought two guns with him, a .38 and a .22 caliber handgun, kept the .22 for himself and gave the .38 to Petersen. (*Id.*) Cielto armed himself with a club resembling a baseball bat studded with nails. (*Id.*) At about 10:00 p.m., these three young marauding thugs drove west to the Subbase area and the tennis courts in a black Suzuki Samurai Cielto had borrowed. (*Id.* ¶ 12.)

At the Subbase tennis courts, Petty Officer Nendze had begun a collect call to his wife at about 10:10 p.m. (*Id.* ¶ 13.) Lts. Gardella and Barlett took a seat in the nearby grandstand to wait until the phone was available. (*Id.*) At about 10:20 p.m., Lts. Gardella and

---

[3] The Court adopted the Presentence Report on defendant Petersen as part of the proceedings against defendant Petersen at the sentencing hearing. (*See* Crim. No. 1995-63, Doc. No. 9, Minutes of Proceedings Aug. 23, 1995, at 2). Without particularizing his objections or giving his rendition of what was the correct version, Petersen has waived any objection to use of the facts recited in the Presentence Report for purpose of the factual basis for this opinion.

Bartlett noticed a black vehicle which slowed as it drove past them. (*Id.* ¶ 14.) Initially concerned, the two officers left the grandstand and began walking back toward the telephone. They relaxed as they saw the vehicle leave the area. (*Id.*)

Having assessed their prey with his confederates, the driver, Cielto, parked the vehicle just north of the tennis courts. (*Id.*) The three finalized their plan to stalk the three servicemen on foot and rob them. (*Id.*) At about 10:30 p.m., the three soon to be killers walked in front of the grandstand and approached the military men from the southern end of the tennis courts. (*Id.* ¶ 15.)

Lts. Gardella and Bartlett saw the three young thugs approaching their group, and, with Cielto tapping his club against the ground, realized the danger and warned Petty Officer Nendze. (*Id.*) Before they could get away, however, Petersen sprang upon them with gun in hand and demanded their valuables. Lt. Gardella responded that he had no money, since he had left the ship just to make a phone call. (*Id.*) Lt. Gardella emptied some of his pockets, producing only a military identification card, and a calculator from his front pocket, to which Petersen replied, "No, no, money." (*Id.*) Offering no resistance whatsoever, Lt. Bartlett immediately reached into his back pocket for his wallet. (*Id.*)

By this time, the minor and Cielto had reached Petty Officer Nendze, who was facing the other way and occupied with his phone call. When Nendze did not respond to the minor's instruction to get off the phone, the manly Cielto got his attention by hitting him from behind with the club. (*Id.* ¶ 16.) The juvenile demanded money, but Petty Office Nendze told them he didn't have any. (*Id.*) Although Petty Officer Nendze was able to elude Cielto's renewed attack with the nail-studded club, the juvenile shot him in the back as he was walking away toward the grandstand. (*Id.*) Petty Officer Nendze then began to run. He got away despite two more shots fired at him by the minor, which went wide of their mark. (*Id.*)

When Petty Officer Nendze fled, Lt. Bartlett was standing with Lt. Gardella and had his wallet in his hand extended in front of him. (*Id.* ¶ 17.) As Petty Officer Nendze ran past, Lt. Bartlett was bludgeoned in the back of the head by Cielto. (*Id.*) Lt. Gardella suffered a similar fate and was knocked temporarily unconscious.

(*Id.*) When he came to, Lt. Gardella found himself curled up on the grass facing the bleachers. (*Id.* ) Lt. Bartlett was approximately six feet away on his right side with his head on the concrete walk and Petersen standing over him. (*Id.*) Lt. Gardella then saw Petersen point a pistol at his fallen comrade and pull the trigger. (*Id.*) The gun did not fire and Petersen pulled the trigger a second time. (*Id.*) When it still did not fire, Petersen looked at the gun, took aim again, pulled the trigger a third time, and finally succeeded in firing the fatal bullet directly into the head of the helpless and totally defenseless Lt. Bartlett. (*Id.*)

The three killers then made good their escape by returning to their vehicle and driving back to the Bordeaux area. (*Id.*) They disposed of their weapons and agreed with each other that they would not to talk to anyone about their "adventure." (*Id.*)

After a short time, Lt. Gardella stood up and asked Lt. Bartlett if he was okay. (*Id.* ¶ 18.) Amazingly, Lt. Bartlett was still conscious despite the mortal head wound. (*Id.*) Petty Officer Nendze returned to the scene and agreed to look after Lt. Bartlett while, at about 10:40 p.m., Lt. Gardella ran back to the ship for help. (*Id.*) Petty Officer Nendze found and returned Lt. Bartlett's wallet, which he was able to put back in his pocket. (*Id.*) The two wounded servicemen then started to walk back to their ship, eventually receiving assistance from a passing taxi. (*Id.*)

All three victims were flown to the VA hospital in San Juan, Puerto Rico. (*Id.*) Petty Officer Nendze sustained a gunshot wound to the midsection of his back, with the bullet still lodged in his peraspinas muscle because it could not safely be surgically removed. (*Id.*) Lt. Gardella sustained lacerations and contusions to his head, as well as permanent partial hearing loss. (*Id.*) While both Lt. Gardella and Petty Officer Nendze survived their injuries, Lt. Bartlett did not. (*Id.*)

Lt. Bartlett had sustained a gunshot wound in the high middle portion of his forehead, as well as a depressed skull fracture in the right frontal area of his head. (*Id.*) Although he remained conscious until he was transported to Puerto Rico, he never regained consciousness after surgery on June 16, 1993. (*Id.*) Lt. Bartlett was declared brain dead on June 23, 1993. With his wife Gail at his side, he died the next day as a direct result of the bullet Petersen

carefully and deliberately fired into his head while he lay helpless on the ground. (*Id.* ¶¶ 18 & 25.)

It took two years to bring Lt. Bartlett's killers to justice. In early 1995, a special task force from the Naval Criminal Investigation Service ["NCIS"] joined local and other federal officers in the search. (*Id.* ¶ 19.) These efforts finally identified Petersen as the individual responsible for executing Lt. Bartlett. (*Id.*) On January 31, 1995, at approximately 1:00 p.m., Petersen was interviewed by agents of the NCIS as well as local police officers, and eventually confessed to the robbery and the murder, implicating Cielto and the minor along the way. (*Id.* ¶ 20.) The federal public defender was appointed to represent Petersen the next day. (Notice of Criminal Appointment, Feb. 1, 1995, Doc. No. M-3). The minor was arrested on February 2, 1995, after implicating himself, Petersen and Cielto. (Presentence Rpt. ¶ 21.) Cielto was arrested on February 7, 1995. (*Id.* ¶ 22.)

Although Petersen initially pleaded not guilty, the Court was later advised that he had reached an agreement with the Government and wished to change his plea to guilty. (Transcript of Change of Plea Feb. 24, 1995 ["Plea Tr."] at 5). For one hour and eight minutes on February 24, 1995, the Court conducted the colloquy with Petersen required by Federal Rule of Criminal Procedure 11 before his guilty plea could be accepted. The defendant was first sworn and all his statements at the hearing were under oath. (*Id.* at 7.) Petersen stated that he had attended, but had not completed the twelfth grade, was fluent in English, and had no trouble understanding the Court. (*Id.* at 7-8.) Petersen swore under oath that he had never been treated for any mental illness or for any addiction to alcohol or drugs, was not then under the influence of any drugs or alcohol, and had taken no such substances in the twenty-four hours before the hearing. (*Id.* at 8.) Defendant's counsel had no doubt about his client's competency to change his plea to guilty, and Petersen himself reaffirmed there was nothing wrong with him physically or mentally which was preventing him from thinking clearly at the hearing or from understanding the Court's questions. (*Id.*)

The defendant was reminded that he was under oath to tell the truth and the Court explained to him exactly what that meant. (*Id.*

at 9.) Petersen acknowledged that he understood. (*Id.*) He answered yes, when asked if, pursuant to the plea agreement, he intended to plead guilty to all five counts in the information. (*Id.* at 10.) Before the Court would accept the written plea agreement, Petersen was required to review it in open court with his attorney and to initial each page. Defense counsel and the Assistant United States Attorney also were required to put their initials on each page. (*Id.*) The Court then inquired whether Petersen had in fact gone over the plea agreement with his attorney. Petersen again answered yes, and identified the agreement he had just initialed in court as the one he and his attorney had discussed. (*Id.*) The Court then verified that the defendant had the completed application to plead guilty before him, and confirmed that Petersen also had gone over this document with his attorney. (*Id.* at 11.) Only after this verification process was completed did the Court accept for filing the written plea agreement and the application to plead guilty. (*Id.* at 12.) The Court asked Petersen, "Do you understand what the plea agreement said? What's going to happen to you, what you're agreeing to do, and what the Government is agreeing to do concerning that plea agreement?" (*Id.*) Once again, the defendant answered, "Yes." (*Id.*) The Court asked if the written agreement was the whole agreement between the government and the defendant. (*Id.*) Petersen said that it was. (*Id.* at 13.)

The Court then painstakingly went over the terms of the plea agreement, first explaining the possible maximum sentence for each count of the information and to ensure that Petersen understood the potential punishment he faced. (*Id.* at 13-15.) The Court explained the essential elements of each offense in some detail and made sure that Petersen had no questions about them. (*Id.* at 15-17.) In explaining the essential elements, the Court made it clear that one element of the crime of murder in the second degree, to which Petersen contemplated pleading guilty, was that he had acted with malice aforethought, that is, that he had intentionally killed Lt. Bartlett. (*Id.* at 17.) Petersen stated that he understood the Court's explanation. (*Id.*)

Petersen then stated that he understood that he was agreeing that he would receive a sentence of the statutory maximum of twenty-five years on the federal counts he was facing. (*Id.* at 17-18.)

345

Petersen thus fully understood that he would receive a sentence of a total of twenty-five years for all the federal counts. (*Id.* at 18.) The Court also explained that part of his punishment could be a fine under the Sentencing Guidelines, depending on his ability to pay a fine. (*Id.* at 18-21.) The Court went on to explain to Petersen the concepts of restitution and supervised release in the context of the federal charges. (*Id.* at 21-22.) Yet again, the defendant answered that he understood what the Court was telling him. (*Id.*)

The Court then turned to Mr. Petersen's violations of Virgin Islands law, explaining that the prosecution had agreed not to say anything at sentencing, except to recommend that the sentence for violations of territorial law not be added to the sentence on the federal counts. (*Id.* at 24.) Petersen said he understood this. (*Id.*) The Court then pointed out that the sentencing judge did not have to follow the government's recommendation to run the sentence on the Virgin Islands offenses together with the twenty-five-year federal sentence. The Court could add the Virgin Islands sentence to the twenty-five years for the federal offenses, and if that was done, it would not be a reason for Petersen to say, "well, I didn't understand that, and withdraw [his] plea." The defendant was also told that, "What amount, also, that I impose or the sentencing judge imposes, under Virgin Islands offenses, is strictly however that judge decides." Petersen responded that he understood all this. (*Id.* at 24-25.) The Court then covered the defendant's obligations to provide truthful information to probation and to the prosecutor in assisting at his codefendants' trial as required in his plea agreement. Petersen once again said he understood. (*Id.* at 25-27.)

The Court asked Petersen if he had any questions about what he was agreeing to do and what the government was agreeing to do under the plea agreement. Yet once again, Petersen answered that he had no questions. (*Id.* at 27.) He was offered an opportunity to consult with his attorney at that point and his counsel affirmed Petersen had no questions. (*Id.*)

The Court then went over Petersen's constitutional right to the presumption of innocence, the privilege against self-incrimination, to the assistance of counsel, to the right to confront, question and cross-examine witnesses and to have compulsory process to bring

them before the Court, and to his right to trial by jury. (*Id.* at 27-30.) In each instance, Petersen said he understood his rights. (*Id.*) The Court explained that by pleading guilty, Petersen would be waiving, that is, giving up each of those rights, something Petersen said he understood. (*Id.* at 31.)

The Court continued, "So if you plead guilty here today, and the Court accepts it that will be the end of the case, except for sentencing. Do you understand that?" (*Id.*) The defendant answered, "Yes." (*Id.*) The Court asked Petersen if anyone had threatened him to get him to plead guilty and he answered in the negative. (*Id.*) The Court asked if, other than what was contained in the plea agreement, anyone had made any promise or offer to him as an inducement to plead guilty, and yet again Petersen answered in the negative. (*Id.*) The Court asked, "So, if you do enter a plea of guilty, it will be your own free and voluntary act; is that right?" (*Id.*) Petersen answered, "Yes." (*Id.* at 32.) The Court then asked the Assistant United States Attorney to place on the record what the government would be able to prove if the defendant went to trial, which she did. (*Id.* at 32-35.) Based on that proffer, to which Petersen had no challenge, the Court found a factual basis for the defendant to plead guilty. (*Id.* at 35.)

The Court then continued the plea colloquy thus:

[BY THE COURT]: Mr. Petersen, do you have any questions for your attorney or the Court before I ask you how you formally plead?

[BY THE DEFENDANT]: No.

[BY THE COURT]: Do you understand everything we've talked about here this afternoon?

[BY THE DEFENDANT]: Yes.

[BY THE COURT]: Do you understand all of your rights that we just went over?
[BY THE DEFENDANT]: Yes.

[BY THE COURT]: Are you satisfied in all respects with the kind of assistance and representation Mr. Brusch has given you?

347

[BY THE DEFENDANT]: Yes.

[BY THE COURT]: Is there anything you wanted him to do for you that he didn't do?

[BY THE DEFENDANT]: No.

[BY THE COURT]: Are you sure?

[BY THE DEFENDANT]: Yes.

(*Id.* at 35-36.)

The Court then read each count of the information to the defendant and asked him how he pled. (*Id.* at 36-38.) For Count I, assault upon a federal officer in the performance of his official duty, Petersen pled guilty. (*Id.* at 36-37.) For Count II, attempted murder of a federal officer in the performance of his official duty, Petersen pled guilty. (*Id.* at 37.) For Count III, carrying a firearm during a crime of violence, the final federal charge, Petersen pled guilty. *Id.* For Count IV, the territorial charge of murder of Lieutenant Dana Bartlett, Petersen pled guilty. (*Id.* 37-38.) And for Count V, first degree assault under local law, the defendant again pled guilty. (*Id.* at 38.) The Court found that Nefta Petersen was competent and, after having been fully advised of his rights, had knowingly, voluntarily entered pleas of guilty to all counts of the information. (*Id.*) The hearing was adjourned for preparation of the presentence report and sentencing.

Petersen came on for sentencing on August 23, 1995. By that time, however, he had experienced a change of heart. The defendant sought permission to withdraw his plea alleging, *inter alia*, that his lawyer did not adequately explain the plea agreement and had misled him. His counsel, Stephen Brusch, Esquire, perhaps the most aggressive and certainly one of the ablest criminal defense attorneys practicing before the Court, moved to withdraw from the representation.

At the sentencing hearing, the Court declined to permit Petersen to withdraw his plea, declined to permit Mr. Brusch to withdraw as counsel, and sentenced Petersen to 300 months (twenty-five years) on the three federal counts and twenty-five years on the two territorial counts, the twenty-five year Virgin Islands' sentence to be served consecutively to the twenty-five year federal sentence.

An appeal followed and the Court of Appeals for the Third Circuit vacated the sentence, citing as error this Court's refusal to give Petersen an evidentiary hearing to prove his claim that his eminently qualified, court-appointed counsel, Stephen Brusch, had mislead him. *See United States v. Petersen*, 92 F.3d 1174 (3d Cir. 1996) (unpublished opinion).

In obedience to the mandate of the Court of Appeals, new counsel has been appointed and an evidentiary hearing on Petersen's motion to withdraw his plea was held on April 27, 1998.[4] The Court took the motion under advisement at the close of the evidence and argument.

## DISCUSSION

Petersen had the burden to demonstrate sufficient reasons for withdrawing his guilty plea. *See Gov't of the Virgin Islands v. Berry*, 631 F.2d 214, 220 (3d Cir. 1980). In a memorandum in support of his motion to withdraw his guilty plea filed by new counsel, Petersen asserts eight grounds for his position: 1) his plea was not knowing, intelligent and voluntary; 2) he did not understand the terms of the plea agreement; 3) he did not understand the potential penalties for the offenses with which he was charged; 4) he did not understand the Federal Sentencing Guidelines and their applicability to his sentencing on federal charges; 5) he did not understand what an upward departure was, and his agreement to it was not knowing and voluntary; 6) he did not receive the sentencing concessions he understood to be part of the plea agreement; 7) he was deprived of the effective assistance of counsel in that his counsel failed to properly advise him regarding his plea and exerted undue pressure upon him to plead guilty; and, 8) he was

---

[4] By order dated Aug. 14, 1996, the Court appointed Michael Dunston, Esq., as counsel for the defendant. The Court of Appeals was critical of this Court for refusing to provide new counsel to Petersen at sentencing. The appellate court nevertheless refused to allow Attorney Brusch to withdraw from representing Petersen on appeal, even though this kept Mr. Brusch in the very same conflict for which the Court of Appeals chastised this Court. It is a tribute to Attorney Brusch's professional competence that he successfully argued against his own competence.

suicidal at the time of his plea and unable to make an intelligent decision.[5]

Petersen's first six objections are subsumed in his penultimate claim that he was deprived of the effective assistance of counsel (No. 7). Petersen's claim that his plea was not knowing, intelligent and voluntary (No. 1) has to be based on his claim that his counsel had not explained the agreement to him or was exerting undue influence upon him. The defendant's claim that he did not understand the plea agreement (No. 2), to the extent this is any different from not entering a knowing, intelligent and voluntary plea, has to be based on his assertion that Attorney Brusch had not explained it to him. Petersen's claim that he did not understand the potential penalties for the offenses with which he was charged (No. 3) is grounded on his claim that Brusch did not explain it to him. His assertion that he did not understand the Federal Sentencing Guidelines and their applicability to his case (No. 4) stems from his claim that his counsel failed to give him that understanding. Petersen's claim that he did not understand what the term "upward departure" meant, and therefore did not knowingly and voluntarily agree to an upward departure on the federal counts (No. 5), is based on his claim that his counsel did not make sure he understood it. The defendant's claim that he did not receive the sentencing concessions he believed he had agreed to (No. 6) arise from his elemental claim his attorney misled him about the contents of his plea agreement.

The Court will not give separate treatment to defendant's objections Nos. 1 through 6, but will include them in its discussion of his basic and fundamental objection (No. 7) that his original court-appointed counsel was ineffective in assisting him in the proceedings leading up to and including his guilty plea. In examining Petersen's claims of ineffective assistance of counsel

[5] Defendant also claims that he was not given an adequate opportunity to correct his presentence investigation report. To the extent that such formed the basis for imposing his first sentence, this objection has been mooted by the Court of Appeals' decision vacating the sentence and remanding for further proceedings by this Court. Mr. Petersen remains free to raise any such objections when he comes on for resentencing. To the extent the Court has used the presentence report as the factual basis for this opinion, the defendant has waived any objection by failing to submit contrary evidence in support of his motion.

350

(No. 7) and that he was suicidal at the time of his plea (No. 8), the Court will first outline the legal standards for evaluating a defendant's motion to withdraw a plea of guilty. It will then enter its findings of fact, as per the Court of Appeals' instructions.

### Evaluating Defendant's Post-Plea/Pre-Sentence Motion for Withdrawal of the Guilty Plea

"[T]hree factors must be considered when a district court evaluates a motion to withdraw a guilty plea: (1) whether the defendant asserts his innocence; (2) whether the government would be prejudiced by his withdrawal; and (3) the strength of the defendant's reasons to withdraw the plea." *United States v. Jones*, 979 F.2d 317, 318 (1992); *see United States v. Huff*, 873 F.2d 709, 712 (3d Cir. 1989). Even though permission to withdraw a guilty plea before sentencing is more liberally granted than after sentencing, *United States v. Trott*, 779 F.2d 912, 915 (3d Cir. 1985), district judges retain substantial discretion to deny a motion to withdraw a plea of guilty, *Jones*, 979 F.2d at 318 ("A simple shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to force the government to incur the expense, difficulty and risk of trying a defendant, who has already acknowledged his guilt before the court.").

The Court will analyze and apply each of the three *Jones* factors to Petersen's claims.

### Defendant's Asserted Reasons for Seeking to Withdraw His Plea

Addressing the last *Jones* factor first, the Court may permit Petersen to withdraw his plea before sentence is imposed "if the defendant shows any fair and just reason." FED. R. CRIM. P. 32(e). Petersen's rationale for withdrawing his guilty plea must also explain why his present contentions deserve belief, especially since they contradict his sworn statements to this Court at the plea colloquy. A defendant must "give sufficient reasons to explain" why he should be permitted to withdraw his plea. *Jones*, 979 F.2d at 318. Petersen's reasons are now addressed and rejected.

351

## Ineffective Assistance of Counsel

The Sixth Amendment entitles a criminal defendant to counsel whose undivided loyalties lie with him.[6] Peterson seeks to withdraw his guilty plea, alleging that his attorney coerced him to accept the plea agreement or, in the alternative, misrepresented the plea agreement to him. In vacating Petersen's sentence, the Third Circuit Court of Appeals has mandated that this Court hold an evidentiary hearing on the defendant's assertions that his counsel negligently or intentionally misled him about material terms of a plea agreement. *Petersen* at 12. At such a hearing, the district court was required to take sworn testimony from any relevant witnesses including, at a minimum, the defendant and the attorney charged with the misfeasance or malfeasance. Petersen's new counsel exercised his right to cross examine any adverse witness.[7] Testimony taken at the evidentiary hearing in this case on April 27, 1998, as well as other materials in the record form the basis for the findings of fact which follow.

■ To prevail on his claim of ineffective assistance of counsel, Petersen must prove both that his counsel's performance fell below a standard of objective reasonableness and that he has been prejudiced by his counsel's actions. *United States v. Cannistraro*, 734 F. Supp. 1110, 1127 (D.N.J.), *aff'd without opinion*, 919 F.2d 133 (3d Cir. 1990), *cert. den.* 500 U.S. 916 (1991) (citing *Hill v. Lockhart*, 474 U.S. 52, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985)). In assessing defendant's evidence that his counsel was ineffective, trial courts presume that the actions and decisions of the challenged counsel were reasonable. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 689, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)). Indeed, "it is . . . only the rare claim of ineffective assistance of counsel that should

---

[6] The provisions of the Sixth Amendment apply *in toto* within the territory of the Virgin Islands. Rev. Org. Act § 3, 48 U.S.C. § 1561.

[7] Whether new counsel is appointed for a defendant's motion to withdraw a plea will be decided as the circumstances require. *Petersen*, at 12. Here, the Court appointed new counsel pursuant to the Court of Appeals' mandate. In general, however, appointment of new counsel for the evidentiary hearing is not necessary where the defendant's assertion of ineffective assistance fails on its face to present a colorable basis for the claim. *See United States v. Byers*, 11 F. Supp. 2d 649, 1998 U.S. Dist. LEXIS 10346, No. 1992-52, 1998 WL 384486 at *6 (D.V.I. Jul. 6, 1998).

succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Gray*, 878 F.2d 702 (3d Cir. 1989).

In *Cannistraro*, the district court weighed a claim of ineffective assistance of counsel by a defendant who pled guilty to several counts stemming from his involvement in a conspiracy to manipulate stock prices. 734 F. Supp. at 1113-14. In evaluating the performance of his counsel on the decision to plead guilty and rejecting the defendant's claim of ineffective assistance, the judge noted that counsel had weighed the possible sentence Cannistraro could have received had he gone to trial and had negotiated a plea agreement which minimized the sentence the defendant would actually receive. *Id.* at 1132. Counsel's success in this regard led the *Cannistraro* court to conclude the attorney's conduct there exceeded the objective standard of reasonableness. *Id.* at 1133. On that basis, the judge denied the defendant's request to withdraw his plea of guilty. *Id.*

Following Petersen's arrest on January 31, 1995, Assistant Federal Public Defender Stephen Brusch was appointed to represent him on February 1, 1995. Counsel met with Petersen at least four times before the Rule 11 hearing at which the defendant pled guilty on February 24, 1995. (Transcript of Evidentiary Hearing, April 27, 1998, [Tr. Evid. Hr'g.] at 77.) Soon after meeting with Petersen and determining both that he wanted to plead guilty and that there was indeed a factual basis for such a plea, Brusch secured the government's agreement to a guilty plea.

The agreement Brusch negotiated included reduction of the impending Virgin Islands charge of murder in the first degree to second degree murder, which avoided a mandatory sentence of life in prison without any possibility of release.[8] (Govt's Exhibit 1 ¶ 1.) The agreement also included a requirement that the prosecution at sentencing would not allocute, except to request that the sentence on the local charges run concurrent with the twenty-five-year sentence on the United States charges. (Id. ¶ 2.) Considering the overwhelming evidence against Petersen, which included the

---

[8] "Whoever commits murder in the first degree shall be imprisoned for the remainder of his natural life without parole." 14 V.I.C. § 923(a) (emphasis added).

testimony of the two surviving victims, one of his codefendants, and Petersen's own confession, Brusch had reduced the very real possibility that the defendant would spend the rest of his young life in prison to a maximum of twenty-five years plus a local term of years with possibility of parole. As a bonus, Attorney Brusch also negotiated the definite and reasonable chance that Petersen would receive concurrent sentences with a maximum prison term of only twenty-five years. Petersen was twenty years old when he was arrested in January of 1995.

Petersen has also alleged that his counsel put undue pressure on him to plead guilty. Stephen Brusch denied the allegation and testified that he did not pressure Petersen to plead guilty or exert any influence on his client, other than by laying out the government's evidence and the possible penalties for the crimes Petersen was charged with, including the fact that he might face life in prison for murder in the first degree. Brusch testified that he told Petersen he always had the option of going to trial, and that he, Brusch, would do his utmost to defend him at trial if that was Petersen's decision. (Tr. Evid. Hr'g. at 56-57.)

Petersen attempted to support his claims of ineffective assistance by testifying that Brusch repeatedly stressed the fact that he might be sent to jail for life if he did not agree to a plea, (*Id.* at 102), and that Brusch sent him some sixty letters from the victims' family members saying that Petersen should receive the death penalty (*Id.* at 83). Additionally, Petersen's father testified that Attorney Brusch wanted him to plead guilty from the time his son was arrested. (*Id.* at 72.)

■ Buttressing Mr. Brusch's testimony is the language of the plea application, acknowledged and initialed by his client in open court, that no one put any undue influence on him to get him to change his plea. (Govt's Exhibit 2 ¶ 18.) Further, the Court elicited from Petersen at the plea colloquy his assurance, under oath, that no one had applied any pressure or made any promises, other than those in the plea agreement, to make him change his plea to guilty. Accordingly, the Court finds that Brusch's assistance met and exceeded the required standard of effective assistance of counsel. It further finds that Attorney Brusch exercised no undue pressure on his client to enter his guilty plea. While this disposes of Petersen's

main claim of ineffective assistance of counsel, the Court must still determine whether his guilty plea was knowingly, voluntarily, and understandingly made.

Attorney Brusch testified that Petersen understood that he faced murder in the first degree, with life in prison without parole. (Tr. Evid. Hr'g at 13-14.) Former counsel further testified, under questioning from defendant's present counsel, that he explained to Petersen, and that Petersen understood, that he was pleading guilty to each of the charges in the information. (*Id.* at 23.) Brusch also swore that he explained and Petersen understood that he would receive a sentence of twenty-five years on the federal charges and that the prosecutor would recommend that the sentencing judge begin the sentence on the territorial charges at the same time as the federal charges. (*Id.* at 23-24.) Brusch testified that he explained in detail the possible maximum penalties Petersen could receive on his plea, the Sentencing Guidelines and how they applied to Petersen and to his plea agreement. (*Id. at 24-30.)* Former counsel also testified under oath that he was careful to explain to his client the possibility that the sentencing judge might not agree to the government's recommendation on concurrent sentencing and that it would be no basis for Mr. Petersen to withdraw his plea if the court did not do so. (*Id.* at 27-28.) Brusch read the separate plea application to plead guilty to and with Petersen, and he went over the plea agreement with his client on at least two occasions. (*Id.* at 31, 52.).

Both the plea application and the plea agreement itself also detail the extent of the agreement between Petersen and the prosecution. The plea agreement, each page of which was initialed by Petersen in open court, made clear that there will be a sentence of twenty-five years on the federal charges and that government counsel would recommend that the sentence for the territorial felonies be run concurrently with the twenty-five-year federal sentence. (Govt's Exhibit 1 ¶ 3.) Petersen's application to plead guilty, each page of which he also initialed in open court, acknowledged that there was a written plea agreement, that his attorney had explained it to him, and that he understood it. (Govt's Exhibit 2 ¶ 20.) The application also correctly summarized the essential terms of the plea agreement, namely, that the government would

355

not charge Petersen with first degree murder, that Petersen would receive a twenty-five-year sentence on the combined federal charges (counts I to III), and that the Government would recommend the sentence for the territorial charges be run at the same time as the imprisonment on to the federal charges. (*Id.*)

The plea agreement explicitly stated the potential maximum penalties for each offense to which Petersen plead guilty. (Govt's Exhibit 1 ¶ 1.) The plea agreement was particularly detailed on the application of the Sentencing Guidelines to the federal charges and that Petersen's bargained-for federal sentence of twenty-five years was an upward departure under those Guidelines. (*Id.* ¶ 3) ("[B]oth the defendant and the United States Attorney agree that defendant will receive a sentence of imprisonment on [the federal counts] of not less than 25 years . . . .") The plea agreement clearly recited that the Court was not bound by the agreement of the defendant and the prosecutor to recommend concurrent sentences for the federal and territorial counts. (*Id.*) ("[T]he court shall not be bound by the recommendation of either party as to the sentences to be imposed on [the territorial counts].") Both documents were signed by Petersen and his counsel, with Petersen verifying his signature and initialing each page in the agreement. (Govt's Exhibit 1 & 2.)

Then too, as already recounted, the Court went over the terms of the plea agreement with Petersen in some detail during the plea colloquy on February 24, 1995. This Court explained the agreed-upon sentence of twenty-five years for the federal counts, the fact that there would be an additional sentence on the territorial counts, and the fact that the Court was not bound by the government's recommendation that the period of imprisonment on both federal and territorial sentences be served at the same time. Petersen was thus told, and said he understood, that he could receive more than twenty-five years in prison. (Plea Tr. at 24-25.) The Court further explained that, should the Court reject the prosecution's recommendation for concurrent sentencing, this would not be a basis for Petersen to withdraw his plea. (*Id.*) Even had Attorney Brusch not explained and even if he had misinformed the defendant about the plea agreement, which the Court finds was definitely not the case, and even had Petersen not understood the plea agreement before

the plea colloquy, of which there is no credible evidence, the Court went over it with him, explained it to him, and Petersen acknowledged in open court under oath that he understood the bargain and had no questions about it.[9]

As might be expected, the testimony of defendant and his father contradicted that of Attorney Brusch. According to the defendant's father, Petersen was concerned that Brusch was not doing enough for him from the time of his arrest. (Tr. Evid. Hr'g at 63.) The elder Mr. Petersen also relayed that his son told him it was his understanding he would be sentenced to twenty-five years. (*Id.* at 65.) The father also testified on direct that he was unable to secure from Mr. Brusch documents his son had requested relevant to his case. (*Id.* at 66.)

For his part, the defendant declared that Attorney Brusch misled him and did not try to help him. (*Id.* at 74-75.) He testified he was not aware that there were federal and territorial charges included in the information against him and that he never saw the information filed in his case. (*Id.* at 75.) He claimed that he had never heard of the federal Sentencing Guidelines until he got to prison on the mainland United States. (*Id.* at 76.) Petersen testified that his understanding of the plea agreement was that he would plead guilty in exchange for a sentence of twenty-five years. (*Id.* at 79-81.) Petersen further stated that he went along with the plea colloquy only because Attorney Brusch told him he had to cooperate. (*Id.* at 96.)

Not only is the Petersens' testimony directly contradicted by Attorney Brusch, but also by the plea agreement and the plea application, as well as the defendant's own words at the plea colloquy. Petersen's responses on February 24, 1995, were lucid and showed that he understood the proceedings and the essential terms of his guilty plea. Petersen's demeanor, while subdued as would be expected for a plea to such serious crimes, was nevertheless appropriate, with not the slightest hint of any mental impairment or delusion. Petersen's credibility was seriously un-

---

[9] *Compare United States v. Greiner*, 1992 U.S. App. LEXIS 20208, No. 91-50588, 1992 WL 204012 at *1 (9th Cir. Aug. 24, 1992) (Where an attorney makes an erroneous prediction of the sentence, the guilty plea will still be valid if the district court has fully apprized the defendant it is free to impose a higher sentence.).

dermined when he quibbled and would not agree to the simple fact that the signatures and initials on the plea agreement were his. (*Id.* at 88-89.) There is not a scintilla of evidence in the record to corroborate the Petersens' account of the relevant events, and the Court finds their testimony on this issue to be totally unworthy of belief.[10] The Court finds the testimony of Attorney Brusch to be credible and to be corroborated by the record.

■ The Court also finds that Petersen made a knowing, voluntary plea of guilty and understood the terms and conditions of that plea. It also finds he understood the potential penalties for the charges to which he was to plead guilty and that he was agreeing to a sentence of twenty-five years on the federal charges and a separate sentence on the local charges.

The Court finds that the evidence does not support a conclusion the defendant received ineffective assistance of counsel. Petersen has not carried his burden of establishing sufficient reasons he should be permitted to withdraw his pleas of guilty.

### Defendant's Claim He Was Suicidal When He Pled Guilty

As his last ground for withdrawing his plea, Petersen asserts he was suicidal at the time his guilty plea was taken, which condition prevented him from making intelligent decisions. The Court has found no case from this or any other Circuit which holds that a defendant who has suicidal thoughts at a change of plea hearing is incapable of understanding what he is doing or thereby could not have acted knowingly and voluntarily. Petersen has failed to carry his burden of persuasion on the issue. He has not supplied any legal precedent, let alone medical evidence, in support of his position.

Only the defendant's own assertions and those of his father comprise the factual support for his claim he was suicidal at the time of his plea. The elder Mr. Petersen testified that his son wrote to him from jail saying he was thinking of suicide.

---

[10] A court is not required to accept the self-serving testimony of a defendant and his family as a basis for withdrawal of a guilty plea. *See United States v. Smith,* 818 F. Supp. 123, 126 (W.D. Pa. 1993).

358

[BY DEFENDANT'S COUNSEL]: When you spoke with [your son] on the phone or in the letters, did he say anything before he was sentenced concerning his state of mind?

[BY MR. PETERSEN]: Yes. I mean, he told me in more than one letter that he was thinking about committing suicide. And I could understand the pressure he was under, because I know the way I brought him up and the situation he was in was completely two different things.

(*Id.* at 67.) However, the elder Petersen never told anyone about his son's alleged suicidal thoughts, and the letter or letters in question were destroyed, the father maintains, in Hurricane Marilyn. (*Id.* at 70-71.)

During his direct examination, the defendant gave the following account of his alleged suicidal disposition:

[BY DEFENDANT'S COUNSEL]: There's been some discussion here concerning whether you had thoughts about committing suicide between the time that you had pled guilty and the time of your sentence.

[BY THE DEFENDANT]: Yeah.

[BY DEFENDANT'S COUNSEL]: Did you have any discussions with Attorney Brusch about that?

[BY THE DEFENDANT]: No. I don't think I told him. I don't think I told him that before I took the plea. But I think I did, I tell him after that, yeah.

[BY DEFENDANT'S COUNSEL]: Before you entered the plea or at the time you entered the plea — let me ask you that. At the time you entered the plea —

[BY THE DEFENDANT]: Yeah.

[BY DEFENDANT'S COUNSEL]: — what was going through your mind?

[BY THE DEFENDANT]: Well, you know, just killing myself, you know, I wasn't, I didn't really didn't plan to stay in jail for like a year. I never even, I never even

thought that far. I would just kill myself, you know, just kill myself. It didn't really matter what the Court was going to do. I was just planning on killing myself, and that was that.

[BY DEFENDANT'S COUNSEL]: Did you tell that to anyone?

[BY THE DEFENDANT]: For what?

[BY DEFENDANT'S COUNSEL]: Did you feel that any-one would care to know that?

[BY THE DEFENDANT]: No.

(*Id. at 83-84.*) Other than his testimony and that of his father, Petersen put on no evidence to corroborate this claim.

■ Not only did Petersen admit that he never mentioned his thoughts of suicide at any time before he announced his desire to withdraw his plea, but his medical records also show he never claimed to have had any suicidal thoughts or attempts. (Govt's Exhibit 3.) Indeed, the medical history Petersen gave at the detention center in Miami on June 23, 1995, during his intake screening, reflect that he denied any prior history of suicidal thoughts or attempts. *Id.* Further, at the plea colloquy, Petersen swore under oath that he had no mental problems which would prevent him from intelligently entering his plea. (Plea Tr. at 8.) Lastly, and to reiterate, Petersen's answers throughout the plea colloquy were entirely rational and showed that he understood the proceedings, the information being given to him, and the conse-quences of his actions. (Plea Tr. *passim.*) The Court therefore finds from the overwhelming weight of the evidence that Petersen was not suicidal at the time he entered his plea, and rejects his testimony to the contrary. Moreover, Petersen has presented abso-lutely no evidence that these thoughts could have affected or did affect his ability knowingly and voluntarily to change his plea from not guilty to guilty. Consequently, Petersen has presented abso-lutely no just and fair reason why he should be permitted to withdraw his plea.

### Petersen's Failure to Assert His Innocence

Other than by his initial plea of not guilty, Petersen has never asserted that he was innocent, or even not guilty, of the crimes to which he has pled guilty — not at the evidentiary hearing, not in any of the documents he filed in support of his motion, and not in the proposed findings of fact he submitted at the Court's instruction after the hearing upon his motion to withdraw his guilty plea. (*See* Defendant's Proposed Findings of Fact, Doc. No. 47, at 4).

In *Jones*, the defendant sought to withdraw his plea on the ground that he had been set up to commit the offense to which he pled guilty. In upholding the district court's denial of defendant's motion, the Third Circuit Court of Appeals observed that a defendant "**must not only assert his innocence**, but give sufficient reasons to explain" why he should be permitted to withdraw his knowing and voluntary plea. *Jones*, 979 F.2d at 318 (emphasis added).

█ Petersen's failure to claim he is not guilty may not necessarily require denial of permission to withdraw his guilty plea,[11] especially where he claimed it was not knowingly and voluntarily entered. His failure to deny his guilt is nevertheless a factor *Jones* requires this Court to consider, in addition to weighing the strength of Petersen's reasons he should be allowed to withdraw his plea. Since the Court has already weighed the sufficiency of Petersen's reasons and found them utterly insufficient, his failure to deny his guilt for the crimes to which he plead guilty merely serves to bolster the Court's denial of his motion to withdraw that guilty plea.

### Prejudice to the Government

Where, as here, a district court finds that no just or fair reason has been advanced why the defendant should be permitted to withdraw his guilty plea, the Court need not find prejudice to the government if the plea is withdrawn in order to deny Petersen

---

[11] *See United States v. Quiroga-Cordova*, 1992 U.S. Dist. LEXIS 12333, No. 91-00201-01, 1992 WL 202007 at *3 (E.D. Pa. Aug. 13, 1992) (defendant's failure to assert innocence held not outcome determinative of his motion to withdraw guilty plea).

permission to withdraw the plea. *United States v. Harris*, 44 F.3d 1206, 1210 n.1 (3d Cir. 1995) (citing *United States v. Martinez*, 785 F.2d 111, 114-16 (3d Cir. 1986)). So the record will be complete, the Court nonetheless finds reason to believe that the government indeed would be prejudiced if Petersen were to be allowed to withdraw his guilty plea.

In exchange for agreeing not to seek to proceed against him as an adult criminal, the government procured the cooperation of Petersen's juvenile companion. The juvenile codefendant has already served almost all of his necessarily much more lenient term of detention. Once he is released, he will not be under any term of supervised release or other basis for enforcing his plea agreement if he chooses not to cooperate with the prosecution. There is thus serious ground to doubt that the juvenile's cooperation could now be secured if the case against Petersen were required to go to trial.

■ Accordingly, the Court finds that the Government would be prejudiced if the Court permitted the defendant to withdraw his knowing and voluntary plea of guilty.

### CONCLUSION

Like the Court of Appeals, this Court does not take lightly the right of every criminal defendant to cloak himself in the presumption of innocence. *See Jones*, 979 F.2d at 318. But where that cloak has been knowingly and voluntarily shed by the defendant himself, in the full light of the protections to which he could avail himself and the evidence he would face were he to go to trial, its protection is lost for all time.

The defendant's motion to withdraw his guilty plea is denied. An appropriate order shall issue.

**ENTERED this 28th day of August, 1998.**